**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **DERRICK SCOTT** | : | **CIVIL ACTION NO.: 05-2024-P** |
| **VERSUS** | : | **JUDGE: WALTER** |
| **ROBERT DAVIS, ET AL** | : | **MAGISTRATE JUDGE: HORNSBY** |

## AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF CLAIBORNE**

I, **ANGIE HUFF**, the undersigned affiant, having first been duly sworn, did depose and state under oath the following:

1. That I am currently employed by the Louisiana Department of Public Safety and Corrections (Department) Corrections (Department) as an Assistant Warden at the David Wade Correctional Center at Homer, Louisiana. I have been employed as an Assistant Warden at DWCC for approximately ___ years. I have been employed at DWCC for approximately ___ years.

2. The attached is a true and correct copy of **EMPLOYEE POLICY MEMORANDUM NUMBER 02-01-005**, as maintained in the normal course of business by the Louisiana Department of Public Safety and Corrections, during July 2005.



Blumberg No. 5118
EXHIBIT
1

The above facts are true and correct to the best of my knowledge, information and belief.

**WITNESSES:**

______________________________ ______________________________
SIGNATURE **ANGIE HUFF**

______________________________
PRINT

______________________________
SIGNATURE

______________________________
PRINT

**SWORN TO AND SUBSCRIBED** before me this _____ day of March, 2007, in Homer, Louisiana.

______________________________
**NOTARY PUBLIC**

*DEPARTMENT OF*
*PUBLIC SAFETY AND CORRECTIONS*
*DAVID WADE CORRECTIONAL CENTER\FWCC*

*VENETIA T. MICHAEL, WARDEN* *RICHARD L. STALDER, SECRETARY*

## *EMPLOYEE POLICY MEMORANDUM #02-01-005*

*(ACA Standards #4-4090 (3-4087), 4-4092 (3-4089), 4-4190 (3-4183), 4-4199-4203 (3-4191-95), 4-4206 (3-4198), 4-4224 (3-4212), 1-ABC-1D-15, 1D-16, 3A-16, 3A-24, 3A-25, 3A-26, 3A-27, 3A-28, 3A-31)*

*DATE:* *December 23, 2003*

4190 *SUBJECT:* *Use of Force*

4201
4203 *REFERENCE:*
1. *ACA Model Policy on Use of Force*
2. *ACA Guidelines for the Development of Policies and Procedures for Use in Adult Correctional Institutions*
3. *Department Regulation #C-02-006*

*TO WHOM THIS REGULATION APPLIES:* *All Security Personnel*

4092
4190
4199
4200
1. *PURPOSE:* *To provide guidance regarding the use of force. This includes physical force, chemical agents, firearms, electronic capture shield and other similar devices, intermediate/impact weapons, restraints, less than lethal munitions and other tactical equipment as authorized.*

4202
4206
4224
2. *DEFINITIONS:*

A. *Inmate:* *Anyone committed to the custody of the Department (whether as an adult or juvenile in this context).*

B. *Force:* *Bodily contact of some nature-either with or without the use of restraint, electrical device, chemical agent, less-than-lethal munitions and device or firearm-which causes someone either to act in a manner contrary to his intent or to change his behavior to the desired action.*

C. *Necessary Force:* *Force needed to gain control of an individual.*

D. *Reasonable Force:* *Force justified by the specific elements of a situation, such as the amount of force responded to, a person's perception of danger, the existence of non-forceful alternatives, and any other relevant factors.*

A

E. *Excessive Force: Force used in a situation justifying force that exceeds the force necessary to control the situation or continues after the person is subdued or restrained.*

F. *Non-deadly Force: Force which normally causes neither death nor serious bodily injury.*

G. *Deadly Force: Any intentional force that is capable of causing death or serious physical injury.*

4190 H. *Restraints: Mechanical devices used to restrict movement for security or medical purposes. (Refer to Department Regulation B-06-001, Health Care - Utilization of Medical Restraints, for the use of restraints for medical purposes).*

4199 I. *Chemical Agent: An active substance, such as gas, mace or irritant dust, used to defer activities that might cause personal injury or property damage.*

4199 J. *Electronic Capture Shield: An electronic device which delivers an electronic charge when activated by the operator, used to defer activities that might cause personal injury or property damage.*

4199 K. *Electronic Restraint Belt: An electronic device which delivers an electronic charge when activated by the operator. Used to restrict movement for security or medical purposes.*

4199 L. *Intermediate/Impact Weapons: Non-lethal weapons which are used as an alternative to deadly force (See Weapons List).*

M. *Less-than-Lethal Munitions and Devices: A substantial array of low-lethality weapons which allow a wide range of options which can be used within the use of force continuum. Less-than-lethal munitions and devices should be used as an alternative to deadly force whenever possible under prevailing circumstances.*

4190
4199
4203
4206 N. *Prostraint Violent Prisoner Chair: A restraint chair used to prevent injury to others, oneself, or serious property damage. A device used to restrict movement for security or medical purposes.*

*<u>POLICY</u>: It is the policy of the Secretary that all reasonable steps be taken to minimize situations requiring the use of force by staff against inmates and to minimize the amount of force used in those situations. It is recognized, however, that force may be necessary to accomplish the goals of the Department (including public safety, the safety of staff and inmates, and the maintenance of stability within the institutions).*

*This policy is not designed to discourage employees from using force when it is*
4190 *necessary, but to assist them in acting reasonably when confronted with situations*
4203 *requiring the use of force.*
4206

*It is further the policy of the Secretary that gas, mace, irritant dust, the electronic capture shield, or intermediate/impact weapons or less than lethal munitions and devices may be used when all available less drastic measures fail to accomplish control in handling group disturbances and subduing individuals and only by staff specifically trained in their use. Said force employed shall be proportional to the threat to which it is a response and shall cease when the resistance ceases. The use of gas, mace or irritant dust as set forth herein is based on the concept established by the American Correctional Association that in quelling disturbances such use may be more humane in that it generally causes no serious or lasting damage and can pose less potential for injury to inmates and staff than other types of physical force.*

4206 *All uses of force shall be managed and monitored by appropriate supervisory personnel whenever possible. Use of force consists of physical contact with an inmate in a confrontational situation to control behavior and enforce order. Use of force includes use of restraints (other than for routine transportation and movement), chemical agents, firearms, electronic capture shield and other similar devices, intermediate/impact weapons, less than lethal munitions and other tactical equipment as authorized.*

*When the situation allows, all planned uses of force should be recorded using the video recording equipment located in the South/North Unit Manager's Office or in N-3 and N-4 Housing Unit. At Forcht Wade, the video recording equipment is located in Control Center One and Control Center Two. If the determination to use the video recording equipment is made by the highest ranking officer on the scene, then an officer who has received familiarization training with the recording equipment will be assigned the duty of recording the use of force. During the recording, the current time/date should be continuously displayed on the recording. Once the camera begins recording, all officers on the scene should identify themselves and their assigned responsibilities. The use of force shall be recorded in its entirety including the treatment by medical/mental health staff at the conclusion of the use of force. Any decision to not use the video recording equipment must be made by the highest ranking*

*security officer on the scene and shall be explained in writing. Examples of reasons why the recording equipment may not be used includes the following: The time used setting up the equipment would hamper the efforts to prevent an act which could result in death or severe bodily harm to one's self or to another person. The inmate is creating such a disturbance that delaying the use of force to gain compliance places staff and/or other inmates in an unsafe situation. At the conclusion of a recorded use of force, the highest ranking officer on the scene will be responsible for securing the video tape and submit it to the appropriate Unit Manager for review of the use of force. The Unit Manager will submit the original recording to the Warden's Office for review as soon as possible. If the recording equipment malfunctions for any reason, the highest ranking officer on the scene must explain in writing the malfunction (reason, length of time, etc.)*

*USE OF FORCE GUIDELINES:*

4199 A. *General Considerations*

4206
4190 1. *Whenever possible, the determination to use force shall be made by the highest ranking supervisor in the immediate area.*

2. *Whenever possible, force shall not be used against mentally ill or mentally retarded inmates before appropriate medical or mental health personnel can be called to the scene.*

4190 3. *Reasonable steps shall be taken to minimize the amount of force used.*

4199
4206 4. *The use of any type of force for punishment or reprisal is strictly prohibited.*

B. *Elements to consider in the review of use of force incidents*

1. *The extent of the injury suffered.*

2. *The need for application of force.*

3. *The relationship between the need and the amount of force used.*

4. *The threat reasonably perceived by the responsible supervisors.*

5. *Any efforts made to temper the severity of a forceful response.*

*C. Deadly force*

*1. Deadly force is force which is capable of causing death or serious bodily injury.*

*2. It may be used only as a last resort and then only in the following instances:*

*a. To prevent the commission of a felony, including escape.*

*b. To prevent an act which could result in death or severe bodily injury to one's self or another person(s).*

*D. Non-deadly force*

*1. Non-deadly force is force which normally causes neither death nor serious bodily injury.*

*2. Physical force, chemical agents, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices may be used only in the following instances:*

*a. Prior to use of deadly force*

*(1) To prevent the commission of a felony, including escape*

*(2) To prevent an act which could result in death or severe bodily harm to one's self or to another person.*

4092 *b. To defend one's self or others against any physical assault.*

4199 *c. To prevent commission of a misdemeanor.*

*d. To prevent serious damage to property.*

*e. To enforce institutional rules.*

*f. To prevent or quell a riot.*

4190
4206 *3. Chemical Agents-Special Conditions*

a. *Chemical agents may be used only by employees specifically trained in their use.*

b. *Chemical agents shall not be used.*

(1) *Without approval of the Warden or designee (See G.a.5), if approval is possible under the circumstances;*

(2) *Repeatedly against an inmate within a short period of time.*

(3) *Whenever possible under prevailing circumstances, medical and/or mental health staff should be contacted prior to the non-corporate use of chemical agents. When it is known that the inmates' medical or mental health condition may mitigate against such use.*

c. *In every case, individuals affected by the agents shall be permitted to wash their face, eyes or other exposed skin areas as soon as possible after use.*

E. *RESTRAINTS AND/OR ELECTRONIC RESTRAINT BELTS (Refer to EMP #02-01-030-Use of Restraints/Inmate Control*

1. *See Employee Policy Memorandum #02-01-030 (Use of Restraints) The purpose of these procedures is to minimize the possibility of injury to staff and maximize the effectiveness of the restraint instrument in accordance with acceptable law enforcement practice.*

2. *Restraints and/or electronic restraint belts shall never be used in the following ways:*

a. *As a method of punishment or for periods of time longer than justified under the circumstances.*

b. *In a way that causes undue physical discomfort, inflicts physical pain or restricts the blood circulation or breathing of the inmate, or for periods of time longer than justified under the circumstances.*

c. *Due to the risk of positional asphyxia an inmate should be restrained in a prone (face-down) position only when necessary.*

*Further, after the restraints are applied, the inmate should remain face-down only as long as necessary.*

3. *Restraints including the restraint chair and/or electronic restraint belt shall never be used around the head or neck of an inmate.*

F. *VIOLENT PRISONER CHAIR:(Refer to EMP #02-01-030-Use of Restraints/Inmate Control.)*

4092 G. *USE OF GAS, MACE, IRRITANT DUST, ELECTRONIC CAPTURE*
4199 *SHIELD, AND INTERMEDIATE/IMPACT WEAPONS AND LESS-*
4206 *THAN-LETHAL MUNITIONS AND DEVICES:*

1. *Gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices may be used against a group of inmates only to quell a riot and/or prevent loss of life, serious injury to person(s), extensive destruction of property, to quell a disturbance that could lead to a serious situation which may jeopardize the safety, security and good order of the institution, or to regain control of the institution or part of it.*

4092
4206

2. *Gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices may be used against an individual only to subdue him in order to prevent loss of life, serious injury to person(s), extensive destruction of property, to quell a disturbance that could lead to a serious situation which may jeopardize the safety, security and good order of the institution or to regain control of the institution or a part of it.*

3. *A determination for corporate or mass use of gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices should be made by the highest ranking supervisor present, preferable the Warden.*

4. *A determination to use gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices on an individual, except in emergency situations (which should be fully explained in writing), should be made by the highest ranking supervisor on duty in the immediate area when the incident is occurring and only after one of the two following chain of events have occurred:*

   a. *Refusal to Cease Disturbance*

1. *The inmate refuses to immediately obey the orders given by the Sgt. to cease the disturbance he is creating and is ordered a second time by the Sgt. and still does not comply to the orders to cease the disturbance. This results in the cellblock Lieutenant being notified.*

2. *The Cellblock Lieutenant reports to the area and issues a 3rd order to the inmate to cease his disturbance. If the inmate complies with the Lieutenant's order, the situation will be considered under control and no force will be used.*

3. *If the inmate does not comply with the 3rd order (issued by Lt.) the Lieutenant will notify the Shift Supervisor (Captain). The Shift Supervisor will report to the area and issue another order (4th) for the inmate to cease his disturbance. If the Shift Captain can not report to the area he can authorize the Shift Lieutenant to issue the 4th order to desist.*

4. *If the inmate complies with this order, the situation will be considered under control and no force will be used.*

5. *If the inmate does not comply with the Shift Supervisor's order to*
*cease the disturbance, the Shift Captain will then use chemical*
4092 *agents to bring the situation (disturbance) under control. If the*
4199 *Shift Captain cannot come to the area he can authorize the Shift*
4206 *Lieutenant to use chemical agents.*
4199

4206 b. *Refusal to Be Restrained*

1. *Use of Chemical agents against an inmate who refuses to comply with restraint orders in accordance with Employee Policy Memorandum #02-01-030 are authorized only as follows:*

4199 2. *If the inmate refuses to immediately obey the orders given so that he can be restrained, he will be given a second order to comply to the proper procedure for placing restraints on him. If the inmate complies with the order he will then be cuffed, placed in leg irons, and no force will be used.*

4199 3. *If the inmate refuses the second order to comply with the procedures for being restrained, the cellblock officer will contact Shift Lieutenant and advise him of the situation. The Shift*

*Lieutenant will issue a 3rd order for the inmate to comply with the procedures for being restrained. If the inmate complies with this order he will be placed in proper restraints. No force will be used.*

4199 4. *If the inmate does not comply with the third order to comply with*
4206 *the procedures for being restrained, the Shift Lieutenant will then notify the Shift Captain. The Shift Captain will go to the area and issue another order for the inmate to comply with the procedures for being restrained. If the Shift Captain can not report to the area he can authorize the Shift Lieutenant to issue the 4th order to be restrained. If the inmate complies with the order, no further force will be used.*

4092 5. *If the inmate does not obey the order to comply with the*
4199 *procedures for being restrained the Shift Captain will then use*
4206 *chemical agents. If the Shift Captain can not come to the area he can authorize the Shift Lieutenant to use chemical agents. If the inmate complies with order no further force will be used.*

6. *If the inmate does not obey the order to comply with the procedures for being restrained, after the use of chemical agents, the Shift Captain will contact (if available) the appropriate supervisors to request the Cell Extraction Team to conduct a cell entry using the least amount of necessary force to achieve compliance. If the Cell Extraction Team is not available, the Shift Captain will assemble available officers to conduct a cell entry using the least amount of necessary force to achieve compliance.*

*If chemical agents are used, the inmate will be given the opportunity to shower and change clothing and will be examined by the medical staff. If he refuses the shower, it will be offered again in thirty minute intervals for a period of two hours.*

E. *If the electronic capture shield is to be used, the highest ranking supervisor on duty in the immediate area where the incident is occurring will designate the officer who will use the shield. Only officers who have been trained in the proper use of the electronic capture shield may be designated to use the shield. The use of the pepper ball launcher will be determined by the shift supervisor. This will be used only after chemical agents have been used per policy, and only by trained personnel. The inmate will be ordered to the cell door to be*

*restrained. If the inmate refuses to obey, he will be advised the pepper ball launcher will be used. If inmate complies, no further force will be used. If the inmate continues to cause a disturbance, an officer trained in the use of the pepper ball launcher will fire the pepper ball launcher at the inmate's torso area avoiding the head, throat, and spine area. If a clear field is not available, the pepper ball should be directed at the nearest obstacle thus breaking the pepper ball and dispersing the agent. If the inmate complies with orders any time during the disturbance, the use of force will be discontinued. The officer will maintain watch to ensure inmate continues to comply with orders. After the use of the pepper ball launcher and the inmate continues to cause a disturbance, the shift captain will make a determination if a cell entry would be needed. (AT ANY TIME DURING THE DISTURBANCE, IF THE INMATE OR INMATES STOPS THE DISTURBANCE ONLY THE AMOUNT OF FORCE NECESSARY TO MAINTAIN SECURITY WOULD BE USED) (THE SHIFT CAPTAIN SHOULD MAKE A DETERMINATION IF THE PEPPER BALL LAUNCHER SHOULD BE USED IF A DISTURBANCE OCCURS ON A TIER, ie to ensure officer and inmate safety and control property damage.*

*In the event of a tactical call out to a disorder of riotous condition, only that minimum force which is deemed necessary to restore order will employed (To include outside agency calls) The use of the pepper ball launcher may be used to quell the disorder, and at the discretion of the tactical commander of his designee to protect life, prevent injury and stop property damage.*

*F.* *When gas, mace, irritant dust, the electronic capture shield, or intermediate/impact weapons are used, only minimum amount necessary to control the situation will be used.*

*G.* *Use of gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices is considered as a use of force.*

*Any excessive use or unauthorized use will result in disciplinary action against the employee who does so.*

*H.* *Gas, mace, irritant dust, the electronic capture shield, or intermediate/impact weapons will not be used as punishment under any circumstances.*

*I.* *Whenever possible under prevailing circumstances, no gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, less than lethal*

*munitions, or physical force will be used against inmates assigned to an area designated as a Mental Health Treatment Unit until the mental health worker is present and has attempted to control the situation unless it is necessary to prevent loss of life, serious injury to person(s) or extensive property damage.*

J. *Gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices will not be used on those inmates who are incapable of responding to the commands and orders being given to them by the staff (e.g. during epileptic seizures, etc.).*

K. *Gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices will not be used on those inmates who remain passive in their cells without causing a disturbance or becoming hostile unless the inmate continuously defies orders to come to the bars of the cell. A determination to use gas, mace, irritant dust, the electronic capture shield, or less-than-lethal munitions and devices under these circumstances should be made by the highest ranking supervisor on duty in the immediate area.*

4199 L. *When gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices have been used, affected individuals will be permitted to wash their face, eyes or other exposed skin areas, as soon as possible after the situation has been brought under control, and the individual will be examined by qualified medical personnel.*

4206 M. *All instances in which gas, mace, irritant dust, the electronic capture shield, intermediate/impact weapons, or less-than-lethal munitions and devices are used shall be reported to the Warden in writing immediately after the incident giving full details.*

4206 9. *USE OF FIREARMS: (Refer also to Department Regulation No. C-01-008 and Employee Policy Memorandum #02-06-001 for additional information regarding firearms.)*

A. *Firearms should be utilized only as a last resort and only as authorized herein.*

B. *In the utilization of firearms, the following procedures shall be followed:*

4206 1. *Verbal warning (if feasible) to cease actions.*

4206

2. *Warning shot (if feasible) to ensure that the inmate is absolutely aware of the seriousness and probable consequence of his actions. (The only exception would be when the circumstances require immediate action to protect life or stop an escape in progress where a verbal warning or warning shot is not practical.)*

4206 3. *Shoot to disable, (render inmate incapable of continuing with action prompting use of deadly force.)*

4206 C. *A "Shooting Review Panel" appointed by the Secretary will review the circumstances surrounding each incident where an inmate/other person is shot by Departmental staff and will make recommendations as necessary.*

4203 10. *The use of pressurized water may be utilized to quell a large group disturbance upon approval of the Warden or his designee.*

11. *Canine units are authorized with appropriately trained staff and canine.*

12. *EXAMINATION BY MEDICAL STAFF:*

4203 *As soon as possible after a situation has been brought under control through use of force, the inmate involved shall be examined by qualified medical personnel. Staff may be referred to institutional medical personnel as appropriate based on the circumstances.*

13. *SECURITY EQUIPMENT:*

*All security equipment will be stored in a secure but readily accessible depository outside of inmate housing and activity areas.*

4092 4206 4200 4201 *A written record will be maintained at each institution of all routine and emergency distribution of security equipment. A monthly inventory will be conducted of security equipment to determine their condition and expiration date if any. The Unit Managers will insure this inventory is conducted on the compounds and forwarded to the Armory officer. The Armory officer will combine all inventory into one comprehensive institutional monthly inventory. When corrections security officers are required to carry state issued handcuffs, they must be worn in a standard handcuff case.*

14. *TRAINING:*

4090 4199 A. *All Corrections Security Officers will be trained in approved methods of self-defense and the use of force as a last resort to control inmates.*

B. *All Corrections Security Officers authorized to use firearms will receive training as outlined in Department Regulation No. C-01-008 and Employee Policy Memorandum #02-06-001.*

4092 C. *All Corrections Security Officers authorized to use chemical agents, the*
4199 *electronic capture shield, intermediate/impact weapons, and less-than-lethal*
4202 *munitions and devices will receive appropriate training in their use and in the*
4206 *treatment of individuals exposed to them.*

4199 15. *REPORTING REQUIREMENTS:*
4202
4206
4199 A. *All situations involving the use of force shall be reported. This includes but is*
4202 *not limited to: (1) discharge of firearm or other weapon, (2) use of chemical*
4206 *agents, (3) use of force to control inmates, (4) inmates who remain in*
*restraints at the end of the shift. All proper paper requirements shall be prepared and submitted to the appropriate Administrative Staff no later than the conclusion of the tour of duty.*

4206 B. *The Unit Manager will officially review all uses of force and complete Form #282 (Review of Use of Force).*

C. *The Warden shall investigate all allegations of improper use of force and shall notify other authorities, as appropriate. In addition, reporting in accordance with Department Regulation No. C-05-001 is required.*

*Venetia T. Michael*
*Warden*

*VTM/bjh*

*Employee Policy Memorandum #02-01-005*
*Use of Force*

*Appendix A-Types of Chemical Agents*

1. *Cap Stun Crowd Control "Burst" Unit (5% active ingredient)*

   *May be used indoors or outdoors but is most effective indoors. Remove cap and depress the spray head to provide a heavy burst of spray up to 25 feet and contains twenty, one second BURST sprays. This gas may cause temporary blindness, induce choking, and nausea. Mucous membranes may swell to prevent all but live support breathing. All effects are temporary and will normally disappear in 30 minutes.*

2. *Cap Stun M4 (1% active ingredient)*

   *May be used indoors or outdoors but is most effective indoors. Remove cap and depress the spray head to provide a burst of spray. This gas may cause temporary blindness, induce choking, and nausea. Mucous membranes may swell to prevent all but live support breathing. All effects are temporary and will normally disappear in 30 minutes.*

3. *Cap Stun M4II (5% active ingredient)*

   *May be used indoors or outdoors but is most effective indoors. Remove cap and depress the spray head to provide a burst of spray. This gas may cause temporary blindness, induce choking, and nausea. Mucous membranes may swell to prevent all but live support breathing. All effects are temporary and will normally disappear in 30 minutes.*

4. *The below listed items will be used in the Pepper Foggers only. A pepper fogger has fuel capacity for 45 minutes of continuous operation.*

   a. *Inert Screening Fog Formulation:*

      *White Smoke only. Has no irritants.*

   b. *#297 Flush Formula and Pepper Fog Flush Mix:*

      *To be used for cleaning the pepper foggers within 48 hours of use.*

5. *Grenades*

*The below listed item can be rolled or thrown by hand while discharging or it can be set in a vertical position:*

*Employee Policy Memorandum #02-01-005*
*Use of Force*

*Appendix A-Types of Chemical Agents*

*Page Two*

a. *#555 CS Grenade Speedheat:*

*FOR OUTDOOR USE ONLY. 1 second after releasing handle, this grenade emits CS through top, bottom and sides for 25-35 seconds. Causes suffocating effects such as in drowning and irritates eyes.*

b. *#2 HC White Smoke Grenade:*

*FOR OUTDOOR USE ONLY. Discharge starts 2 seconds after releasing handle. Multipurpose use. Smoke only. No irritants.*

c. *Cap Stun M5G*

*May be used indoors or outdoors but is most effective indoors. Remove cap and depress the spray head to provide a continuous burst of spray. This gas may cause temporary blindness, induce choking, and nausea. Mucous membranes may swell to prevent all but live support breathing. All effects are temporary and will normally disappear in 30 minutes.*

6. *Protectojet Model 5*

*Can be used indoors or outdoors. Should be dispersed in short one second bursts. Has thirteen one second bursts before needs refilling. If used indoors persons should be moved outside in less than thirty minutes to prevent serious injury.*

7. *Deep Freeze*

*Can be used indoors or outdoors 1% Orthochlorobenzamalonitrile (CS), 1% Oleo Resin Capsicum (OC) and an ultraviolet marking agent dissolved in a blend of solvents designed to project a distance before dispersing to deliver a pressurized mist. Range from 12 to 14 feet approximately four foot spread. One burst will produce a 4 foot irritant cloud at a normal tactical range. First Aid - remove subject to fresh air and face into wind or forced air, flush eyes with water if necessary.*

*Employee Policy Memorandum #02-01-005*
*Use of Force*

*Appendix A-Types of Chemical Agents*

*Page Three*

8. *Freeze +P*

*Can be used indoors or outdoors. 1% CS and 1% OC - non-flammable solvent blend formulated to penetrate skin layers. They deliver active ingredients to the nerve endings quickly for maximum effect. Will incapacitate for approx. 20 minutes. Skin will burn, eyelids will involuntary close, will have difficulty breathing. First Aid - without treatment symptoms will clear up in approx. 20 minutes with no permanent effect. Recovery time may be shortened by washing with free flowing water and soap or by directing a stream of fast flowing air into the face. Use no creams or salves.*

9. *Clear Out*

*Can be used indoors or outdoors. Ingredients - 99% Orthochlorobenzalmalononitrile and a 1% of 1,000,000 SHU Oleoresin Capsicum with ultraviolet marking agent. It will cause no permanent damage. Causes burning and tearing of the eyes, heavy discharge from the nose, difficulty in breathing, disorientation, panic and uncontrollable sneezing. Exposed subjects should be removed to fresh air and faced into the wind. All effects should disappear very shortly. Stream of air from fan will speed recovery. Eyes may be soothed by washing with water. Use no soaps, salves or creams.*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **DERRICK SCOTT** | : | **CIVIL ACTION NO.: 05-2024-P** |
| **VERSUS** | : | **JUDGE: WALTER** |
| **ROBERT DAVIS, ET AL** | : | **MAGISTRATE JUDGE: HORNSBY** |

**AFFIDAVIT**

**PARISH OF CLAIBORNE**

**STATE OF LOUISIANA**

I, **ROBERT DAVIS**, the undersigned affiant, having first been duly sworn, did depose and state under oath the following:

1. That I am employed by the Louisiana Department of Public Safety and Corrections as a Correctional Officer (Sergeant) at the David Wade Correctional Center at Homer, Louisiana (DWCC), and was so employed during July 2005. I have been employed as a Correctional Officer at DWCC for approximately ___ years.

2. At the request of the Attorney General's Office I have reviewed the claims asserted against me in the lawsuit of Derrick Scott, DOC #126372.

3. In his lawsuit, inmate Derrick Scott makes claims of cruel and unusual punishment asserted against him at DWCC on July 10, 2005.

4. As a Correctional Officer (Sergeant) at DWCC during July 2005, I was familiar with DWCC's Use of Force Policy governed under the Department's Employee Policy Memorandum #02-01-005 during July 2005, a copy of which is attached. To affiant's knowledge, the purpose of this program is to provide guidance

Blumberg No. 5118 EXHIBIT 2

regarding the use of force. This includes physical force, chemical agents, firearms, electronic capture shield and other similar devices, intermediate/impact weapons, restraints, less than lethal munitions and other tactical equipment as authorized.

5. According to the Department's Employee Policy Memorandum #02-01-005, Force, Necessary Force, Reasonable Force, and Excessive Force are defined as followed:

(b) Force - Bodily contact of some nature—either with or without the use of restraint, electrical device, chemical agent, less than-lethal munition and device or firearm—which causes someone either to act in a manner contrary to his intent or to change his behavior to the desired action;

(c) Necessary Force – Force needed to gain control of an individual;

(d) Reasonable Force – Force justified by the specific elements of a situation, such as the amount of force responded to, a person's perception of danger, the existence of non-forceful alternatives, and any other relevant factors;

(e) Excessive Force – Force used in a situation justifying force that exceeds the force necessary to control the situation or continues after the person is subdued or restrained.

(See Attachment 1, pp. 1-2, sec. 2(B)(C)(D) and (E).

6. In accordance with Employee Policy Memorandum #02-01-005, physical force may be used to defend one's self or others against any physical assault. (See Attachment 1, p. 5, sec. D(2)(b).

7. Derrick Scott, DOC #126372, was an inmate housed in extended lockdown at DWCC during July 2005.

8. On July 10, 2005, the use Necessary Force on inmate Derrick Scott was required in connection with the following incident:

- On July 10, 2005, affiant, along with DWCC Correctional Officer (Lieutenant) Roderick Malcolm, entered Tier C of the N4 Housing Unit to escort inmates housed on Tier C from the cell to the shower area. Affiant and Correctional Officer Malcolm approached the cell of inmate Derrick Scott and ordered inmate Scott to come to the cell bar door to be restrained. Inmate Scott complied. Inmate Scott was then placed in restrains that consisted of handcuffs and leg-irons.
- On removing inmate Scott from his cell, Scott deliberately pushed affiant without cause. Affiant and Correctional Officer Malcolm took inmate Scott to the floor in an attempt to gain control of the inmate and restore order. Inmate Scott struck the floor with his head and shoulder. Inmate Scott began kicking, biting spitting and hitting at both affiant and Officer Malcolm. Other DWCC Correctional Officers, Sergeant Kidd, Lieutenant Sanders and Lieutenant Evans responded to provide assistance. Lieutenant Malcolm and Sergeant Kidd held inmate Scott's head back and to the side in an attempt to prevent his spitting and biting them. Correctional Officers Sanders and Evans had inmate Scott's legs restrained in an attempt to prevent him from kicking. Affiant held inmate Scott's arms in an attempt to prevent him from striking.

- DWCC Correctional Officer (Captain) John Toffton was also radioed to provide assistance. Upon his arrival, Captain Toffton, gave inmate Scott several direct verbal orders to stop fighting. Correctional Officer Malcolm also gave inmate Scott several direct verbal orders to stop fighting. Inmate Scott refused to comply. As a result, inmate Scott was placed back in his cell and physically restrained until he stopped fighting. Scott's cell door was then closed.
- Inmate Scott later complied with the previous orders to stop fighting. However, DWCC Correctional Officer (Lieutenant Colonel) Danny Mills authorized placing inmate Scott in a restraint chair for security purposes to protect staff. DWCC Medical Personnel was notified. Inmate Scott was later examined and treated by DWCC medical personnel, Nurse Grace Lee.
- Captain Toffton ordered that the video camera be set up. Inmate Scott was placed in the restraint chair. Captain Toffton took pictures of inmate Scott's injuries. Unusual Occurrence Reports (UOR) were also drafted in connection with the incident. A copy of affiant's UOR is attached hereto.

9. I have reviewed the claims in the lawsuit of inmate Derrick Scott. Inmate Scott claims that on July 10, 2005, I intentionally used excessive force against him. I, however, assert the following:

(a) On July 10, 2005, Necessary Force was used on inmate Derrick Scott in an attempt to restore discipline following his physical assault on Affiant and

other DWCC Correctional Officers, and his refusal to comply with several direct verbal orders to stop fighting;

(b) On July 10, 2005, Necessary Force was used on inmate Derrick Scott, only after he physically assaulted DWCC Correctional Officers and refused to comply with several direct verbal orders to stop fighting;

(c) On July 10, 2005, affiant used only the amount of physical force necessary to restore discipline following inmate Scott's physical assault on affiant and DWCC Correctional Officers, and refusal to comply with several direct verbal orders to stop fighting;

(d) Inmate Scott's conduct on July 10, 2005 created a situation which could have resulted in serious physical injury if affiant, and other DWCC Correctional Officers, had not brought the inmate under control;

(e) The incident involving inmate Scott on July 10, 2005, could have been prevented if inmate Scott had not physically assaulted DWCC Correctional Officers;

(f) Any injuries sustained by inmate Scott during the incident that occurred on July 10, 2005 could have been prevented if inmate Scott had complied with direct verbal orders to stop fighting Correctional Officers;

(g) At no time on July 10, 2005 did affiant initiate the use of Necessary Force against the person of inmate Derrick Scott without just cause;

(h) At no time on July 10, 2005 did affiant intentionally or willfully use excessive force against the person of inmate Derrick Scott;

(i) At no time on July 10, 2005 did affiant intentionally or willfully deny inmate Derrick Scott medical treatment.

The above facts are true and correct to the best of my knowledge, information and belief.

**WITNESSES:**

____________________________
SIGNATURE

____________________________
**ROBERT DAVIS**

____________________________
PRINT

____________________________
SIGNATURE

____________________________
PRINT

**SWORN TO AND SUBSCRIBED** before me this _____ day of March, 2007, Homer, La.

____________________________
**NOTARY PUBLIC**

Form: DWCC 56

DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
DAVID WADE CORRECTIONAL CENTER

VENETIA MICHAEL, WARDEN

RICHARD STALDER, SECRETARY

# UNUSUAL OCCURRENCE REPORT

| Name | DERRICK SCOTT | Number | 126372 | Housing | N4C | Date of Incident | 10 July 2005 | Time | Approx 01:30 hours |
|---|---|---|---|---|---|---|---|---|---|
| Location of Incident | | N4C | | | | Witnesses | Listed Below | | |
| Type of Incident | | Assault on Staff | | | | | | | |

DESCRIPTION OF THE INCIDENT (ATTACH ADDITIONAL INFORMATION IF NEEDED)

Witnesses: C/Capt. Toffton, C/Lt. Malcolm, C/Lt. Sanders, C/Lt. Evans, C/Sgt. Kidd, C/sgt. Davis.

On the above date and approximate time, while showering inmates on posted policy #53, C/Lt. Malcolm and myself restrained inmate Derrick Scott #126372 with handcuffs and legirons. On removing him from his cell, he deliberately pushed me. C/Lt. Malcolm and myself then took him to the floor. He started kicking, biting, spitting, and hitting at us. C/Sgt. Kidd, and C/Lt. Sanders, and C/Lt. Evans, and C/Capt. Toffton all responded to assist. C/Lt. Malcolm and C/Capt. Toffton gave him several orders to stop fighting, which he refused to comply. He was placed in his cell and physically restrained until he stopped fighting. The cell door was then closed. He then complied with all orders given. C/Lt. Col. Mills authorized his being placed in the restraint chair. Nurse Lee was notified and examined and treated inmate Scott. The video camera was setup and he was placed in the restraint chair. C/Capt. Toffton took pictures on inmate Scott's injuries.

C/Sgt. Robert Davis
Sgt R. Davis
REPORTING OFFICER

7/10/2005
DATE COMPLETED

6:25 AM
TIME

REVIEWED BY

XC: WARDEN (ORIGINAL)
DEPUTY WARDEN
CHIEF OF SECURITY
UNIT MAJOR
DEPARTMENT HEAD

2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **DERRICK SCOTT** | : | **CIVIL ACTION NO.: 05-2024-P** |
| **VERSUS** | : | **JUDGE: WALTER** |
| **ROBERT DAVIS, ET AL** | : | **MAGISTRATE JUDGE: HORNSBY** |

**AFFIDAVIT**

**PARISH OF CLAIBORNE**

**STATE OF LOUISIANA**

I, **RODERICK MALCOLM**, the undersigned affiant, having first been duly sworn, did depose and state under oath the following:

1. That I am employed by the Louisiana Department of Public Safety and Corrections as a Correctional Officer (Lieutenant) at the David Wade Correctional Center at Homer, Louisiana (DWCC), and was so employed during July 2005. I have been employed as a Correctional Officer at DWCC for approximately ___ years.

2. At the request of the Attorney General's Office I have reviewed the claims asserted against me in the lawsuit of Derrick Scott, DOC #126372.

3. In his lawsuit, inmate Derrick Scott makes claims of cruel and unusual punishment asserted against him at DWCC on July 10, 2005.

4. As a Correctional Officer (Lieutenant) at DWCC during July 2005, I was familiar with DWCC's Use of Force Policy governed under the Department's Employee Policy Memorandum #02-01-005 during July 2005, a copy of which is attached. To affiant's knowledge, the purpose of this program is to provide guidance

Blumberg No. 5118 EXHIBIT 3

regarding the use of force. This includes physical force, chemical agents, firearms, electronic capture shield and other similar devices, intermediate/impact weapons, restraints, less than lethal munitions and other tactical equipment as authorized.

5. According to the Department's Employee Policy Memorandum #02-01-005, Force, Necessary Force, Reasonable Force, and Excessive Force are defined as followed:

(b) Force - Bodily contact of some nature—either with or without the use of restraint, electrical device, chemical agent, less than-lethal munition and device or firearm—which causes someone either to act in a manner contrary to his intent or to change his behavior to the desired action;

(c) Necessary Force – Force needed to gain control of an individual;

(d) Reasonable Force – Force justified by the specific elements of a situation, such as the amount of force responded to, a person's perception of danger, the existence of non-forceful alternatives, and any other relevant factors;

(e) Excessive Force – Force used in a situation justifying force that exceeds the force necessary to control the situation or continues after the person is subdued or restrained.

(See Attachment 1, pp. 1-2, sec. 2(B)(C)(D) and (E).

6. In accordance with Employee Policy Memorandum #02-01-005, physical force may be used to defend one's self or others against any physical assault. (See Attachment 1, p. 5, sec. D(2)(b).

7. Derrick Scott, DOC #126372, was an inmate housed in extended lockdown at DWCC during July 2005.

8. On July 10, 2005, the use Necessary Force on inmate Derrick Scott was required in connection with the following incident:

- On July 10, 2005, affiant, along with DWCC Correctional Officer (Sergeant) Robert Davis, entered Tier C of the N4 Housing Unit to escort inmates housed on Tier C from the cell to the shower area. Affiant and Correctional Officer Davis approached the cell of inmate Derrick Scott and ordered inmate Scott to come to the cell bar door to be restrained. Inmate Scott complied. Inmate Scott was then placed in restrains that consisted of handcuffs and leg-irons.
- On removing inmate Scott from his cell, Scott deliberately pushed Sergeant Davis without cause. Affiant and Sergeant Davis took inmate Scott to the floor in an attempt to gain control of the inmate and restore order. Inmate Scott struck the floor with his head and shoulder. Affiant called for assistance via radio. Inmate Scott then started kicking, biting spitting and hitting at both affiant and Sergeant Davis. Other DWCC Correctional Officers, Sergeant Kidd, Lieutenant Sanders, and Lieutenant Evans responded to provide assistance. Affiant also radioed Captain John Toffton for assistance. Affiant and Sergeant Kidd held inmate Scott's head back and to the side in an attempt to prevent his spitting and biting them. Correctional Officers Sanders and Evans had inmate Scott's legs restrained in an attempt to prevent him from kicking. Sergeant Davis had

inmate Scott's arms in an attempt to prevent him from striking. Affiant then radioed Captain John Toffton for assistance.

- Upon his arrival, Correctional Officer (Captain) Toffton, gave inmate Scott several direct verbal orders to stop fighting. Affiant also gave inmate Scott several direct verbal orders to stop fighting. Inmate Scott refused to comply. As a result, inmate Scott was placed back in his cell and physically restrained until he stopped fighting. Scott's cell door was then closed.
- Inmate Scott later complied with the previous orders to stop fighting. However, DWCC Correctional Officer (Lieutenant Colonel) Danny Mills authorized placing inmate Scott in a restraint chair for security purposes to protect staff. DWCC Medical Personnel was notified. Inmate Scott was later examined and treated by DWCC medical personnel, Nurse Grace Lee.
- Captain Toffton ordered that the video camera be set up. Inmate Scott was placed in the restraint chair. Captain Toffton took pictures of inmate Scott's injuries. Unusual Occurrence Reports (UOR) were also drafted in connection with the incident. A copy of affiant's UOR is attached hereto.

9. I have reviewed the claims in the lawsuit of inmate Derrick Scott. Inmate Scott claims that on July 10, 2005, I intentionally used excessive force against him. I, however, assert the following:

(a) On July 10, 2005, Necessary Force was used on inmate Derrick Scott in an attempt to restore discipline following his physical assault on Affiant and

other DWCC Correctional Officers, and his refusal to comply with several direct verbal orders to stop fighting;

(b) On July 10, 2005, Necessary Force was used on inmate Derrick Scott, only after he physically assaulted DWCC Correctional Officers and refused to comply with several direct verbal orders to stop fighting;

(c) On July 10, 2005, affiant used only the amount of physical force necessary to restore discipline following inmate Scott's physical assault on affiant and DWCC Correctional Officers, and refusal to comply with several direct verbal orders to stop fighting;

(d) Inmate Scott's conduct on July 10, 2005 created a situation which could have resulted in serious physical injury if affiant, and other DWCC Correctional Officers, had not brought the inmate under control;

(e) The incident involving inmate Scott on July 10, 2005, could have been prevented if inmate Scott had not physically assaulted DWCC Correctional Officers;

(f) Any injuries sustained by inmate Scott during the incident that occurred on July 10, 2005 could have been prevented if inmate Scott had complied with direct verbal orders to stop fighting Correctional Officers;

(g) At no time on July 10, 2005 did affiant initiate the use of Necessary Force against the person of inmate Derrick Scott without just cause;

(h) At no time on July 10, 2005 did affiant intentionally or willfully use excessive force against the person of inmate Derrick Scott;

(i) At no time on July 10, 2005 did affiant intentionally or willfully deny inmate Derrick Scott medical treatment.

The above facts are true and correct to the best of my knowledge, information and belief.

**WITNESSES:**

______________________________
SIGNATURE

______________________________
**RODERICK MALCOLM**

______________________________
PRINT

______________________________
SIGNATURE

______________________________
PRINT

**SWORN TO AND SUBSCRIBED** before me this _____ day of March, 2007, Homer, La.

______________________________
**NOTARY PUBLIC**

Form: DWCC 56

DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
**DAVID WADE CORRECTIONAL CENTER**

VENETIA MICHAEL, WARDEN

RICHARD STALDER, SECRETARY

# UNUSUAL OCCURRENCE REPORT

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | DERRICK SCOTT | Number | 126372 | Housing | N4C | Date of Incident | 10 July 2005 | Time | Approx 01:30 hours |
| Location of Incident | | N4C | | | | Witnesses | Listed on previous report | | |
| Type of Incident | Assault on Staff Addendum | | | | | | | | |

DESCRIPTION OF THE INCIDENT (ATTACH ADDITIONAL INFORMATION IF NEEDED)

Information not included in previous reports:

On the above date and approximate time, I C/Lt. Malcolm and C/Sgt. Davis restrained inmate Derrick Scott #126372 for his shower and removed him from his cell. As we exited the cell he pushed C/Sgt. Davis. Both C/Sgt. Davis and myself then took inmate Scott to the floor. We fell to the concrete floor, I struck my left arm against the floor, inmate Scott struck the floor with his head, and shoulder. I called for assistance via radio. Inmate Scott then started biting and kicking and hitting and spitting at us. I gave inmate Scott several orders to stop fighting, and he refused to comply. I pushed his head back to prevent him from biting me, and to the side to prevent him from spitting on me.C/Sgt. Davis grabbed inmate Scotts arms to prevent him from striking us. C/Sgt. Kidd assisted me in holding his head from spitting and biting. C/Lt. Sanders arrived and grabbed inmate Scott's legs to prevent him from kicking. C/Lt. Evans arrived with C/Capt. Toffton and they assisted in moving inmate Scott back in his cell. He was then held in place for a period of approximately a thirty seconds until he stopped fighting. The cell door was closed and inmate Scott then complied with all orders given.

C/Lt. Roderick Malcolm
[signature]
REPORTING OFFICER

7/15/2005
DATE COMPLETED

2:53 AM
TIME

[signature]
REVIEWED BY

XC: WARDEN (ORIGINAL)
DEPUTY WARDEN
CHIEF OF SECURITY
UNIT MAJOR
DEPARTMENT HEAD

2